Curia, per
O’Neall, J.
The case of Morrice vs. the Bishop of Durham, 9 Ves. 399, and the same case, 10 Ves. 521, was a trust to dispose of the ultimate residue of the testatrix’s estate to such objects of benevolence and liberality as the Bishop of Durham in his own discretion shall most approve of; and the Bishop was appointed sole executor. The master of the rolls and the Lord Chanceller ruled that this bequest was a trust, and conferred no personal benefit on the legatee; but that it was too indefinite in its creation, and could not therefore be executed ; and that as it was an estate’undisposed of, in the hands of the executor, a trust resulted for the next of kin. From this summary of that case, it will be seen it cannot reach this case. For there, that was a disposition by will, and the fund was in the hands of the executor, whose whole estate in equity is regarded as upon trust and confidence. So too the trust was not so declared that the objects of the testatrix’s bounty could be ascertained from the will, and hence it could not be supported. The case before us stands upon deeds executed and taking effect in the life time of the intestate, and the case must be considered as if the intestate was himself the complainant, asking that the deeds should be set aside. Without appealing to foreign adjudications, our own conclusively show that such a bill could not be sustained. For the complainant there would stand upon this footing, that he claimed to be relieved from his own act done in ■ fraud of the law. Such a notion has no countenance any where. That the administrator, and consequently the distributee, seeking to avoid their intestate’s deed for fraud, actual or legal, on his part, must claim in his right, and cannot have any superior equities, have been so often decided, that it is not necessary to cite authorities to prove it. Looking at this case in this point of view, there could be no difficulty in saying the complainant cannot recover. But I think the case deserves to be examined in *468 another aspect, and I am satisfied there is nothing in any point of view, in which I am able to regard the case, which ought to defeat the deeds. The Act of 1820 (Acts of ’20 p. 22) merely declares “ that no slave shall hereafter be emancipated but by the Act of the legislature.” Here it will be observed, that the Act does not declare a deed conferring emancipation void. - It cuts off emancipation altogether, except by Act. If emancipation depended upon the execution of the deed alone, then the deed being wholly inoperative, the slave in such case would remain the property of the grantor, and no harm would be done. But the Acts of 1820 and 1800 are regarded in pari materia ; and when so construed, they make this legal provision, that a slave cannot be emancipated in this State, “ but by Act of the Legislature,” and if emancipated without an Act, that then such slave so emancipated, shall be liable to seizure and conversion to his own use by any person. Frazier vs. Frazier, 2 Hill’s C. R., 304. Johnson vs. Linaur, 2 Bail. 137. To constitute an emancipation, something more than the execution of a deed is necessary: there must be a “ parting with the possession of the slaves by the owner or owners,” and thus “ permitting them to go at large and act for themselves.” Senior vs. Sylvester: Young vs. the same, 1 Bail. 642. An invalid attempt to emancipate, so long as the possession remains unchanged, or the slave is in the possession of a legal owner, does not subject him to seizure; Cline vs. Caldwell, 1 Hill’s Rep., 423. These principles have the sanction of so many cases decided by our own Court of Appeals, that I suppose they will be regarded as settled law. Having in a greater Or less degree participated in the decision of them all, I will not now attempt to fortify them by any other reasoning than such as is contained in the judgments pronounced in them.
Taking the law to be as I have stated it, how can it be pretended by the distributee of the donor, that slaves which by him have been conveyed to others, upon the trust and confidence that they would suffer them to work out for their own maintenance, upon the said slaves paying an annual hire of one dollar, are to be regarded as emancipated contrary to the Act of 1820 ? They are still to all intents and purposes, slaves. The persons to whom they are conveyed (Pringle and Chartrand) have the right to govern and protect them. The hire which they pay, however inconsiderable, is a constant recognition of servitude. At law, there neyer copld be a pretence that the slaves were not the pro* *469 perty of Pringle and Chartrand, for at law the trust would not be noticed, unless it had been executed by emancipating the slaves. The State vs. Rhame and others, Dudley’s Law Rep. Rhame vs. Ferguson and others, Rice’s Rep., 196. But if it could, then it is equally clear that the donor and those claiming under him, could not at law avail themselves of this objection. Cline vs. Caldwell, 1 Hill, 423. Chappell vs. Brown, 1 Bail. 528. It is only in equity that the trust can be looked to, and there the question arises which is now made, is the trust unlawful? and which, as I have already shown, would, (if it were) constitute no ground upon which the deeds could be set aside. The distinction is, where any thing is to be done to enforce an Unlawful trust, equity will not set it up or enforce it, or in any way aid its execution, even against the party creating it. But where the case is reversed, and the donor comes to be relieved against it, his position, as the party perpetrating the unlawful act, closes the court against him, and he is left where he ought to be, to stand on the law ; if that help him, it is well; if not, he is punished, as he deserves to be. Had the Act of 1820 declared all deeds, upon trust, for the benefit of slaves, or intended to secure their freedom, void, then the parties representing the intestate would have had no difficulty; For in that case' they could have rested on the law, and succeeded. But here their misfortune is, that there is no such provision. The utmost which can be contended for is, that the slaves have been emancipated contrary to law. For Prin-gle and Chartrand have the actual possession, and may, I suppose, have suffered the slaves to work out for their maintenance, paying an annual hire of one dollar.
Admit that to be emancipation, what is the consequence ? Not that the slaves go back to the donor, but that they are liable to capture ; and equity has no right to say any thing else, for such is the lex scripta. But the question whether the trust is lawful, is worth examination. I confess I have never been able so to regard it. The objeyt of the Act of 1820, was not to deprive a man of the right to do with his own as he pleases, but to prevent him from conferring freedom “ within the State” upon a class of people, as to whom her policy demands that they should be slaves within her limits. If the deed, construed with its trusts, still makes the slaves of the donor, the slaves of the donees, the fact that he has desired that they should give to them the fruits of their labor, cannot be unlawful. They still are slaves, chattels *470 personal, they still are under the dominion of masters, and must so remain. For if Pringle and Chartrand ever relax their hold upon them, and suffer them to go at large and act for themselves xoithout their restraint, actual or constructive, they would be liable to seizure, and would become the slaves of the captors. Kindness to slaves, according to my judgment, is the true policy of slave owners, and its spirit should go (as it generally has) into the making of the law, and ought to be a ruling principle of its construction. Nothing will more assuredly defeat our institution of slavery, than harsh legislation rigorously enforced. On the other hand, as it hitherto has been, with all the protections of 'law and money around it, it has nothing to fear from faxiaticism abroad or examination at home. If it was so that a man dared not make provision to make more comfortabe faithful slaves, hard indeed would be the condition of slavery. For then no motive could be held out for good conduct; and the good and the bad would stand alike. Such has never been the rule applied to our slaves, and such I hope it never will be. I am satisfied that there is nothing unlawful in the trust of the first deed, and if it be necessary to place the case on that ground, the court are prepared to so rule. On all the other grounds, however, previously considered, we are satisfied that the deed is good and must have effect. The second deed is also, I think, good and valid. The only thing which could effect it would be the unlawfulness of the trust, if it be unlawful. It is a good common law conveyance to Pringle and Chartrand of two slaves, for the use of other slaves conveyed to them. In such a case Pringle and Chartrand having the possession, have the right to say, it is a naked conveyance to them; and that the trust is mere matter of advice and recommendation, which they may or may not regard. But suppose the trust is to be noticed, then it would be a gift to the slaves of Pringle and Chartrand, which is, I think, a gift to the owners. According to Fable vs. Brown, 2 Hill C. R. 378, such a gift, even by way of devise, would prevail in equity. I do not agree to the reasoning of that case, however ingenious and able it may be. I concurred in the result merely. For I hold that the personal property of the slave is the property of the master, and that any thing personal given to the slave is given to the master; and this I understand to be the opinion of the Court of Errors. Our legislative Act of 1740, § 34, P. L. 121, shews that *471 unless prohibited by Act, slaves might, by consent of the master, acquire and hold personal property, and that even in prohibited cases, u particular course altogether different from escheat must be pursued to subject the property of the slave to forfeiture. Our decided cases, with the exception of Fable vs. Brown, and the guardian of Sally vs. Beatty, 1 Bay, 260, acknowledge the right of the owner of a slave to all his or her acquisitions. The case of the guardian of Sally vs. Beatty, denies the right of the owner, under special circumstances, to the acquisitions of a slave, and sustained the freedom of a negro, purchased by a slave out of her own earnings. That case goes further than I desire to go ; but it is ample authority to prove, that by the law of this State a slave might acquire personal property, and that such a thing as an escheat was not an incident of it. The case of Hobson vs. Percy, 1 Hill, 277, holds that a master in possession of the personal property of his slave, may maintain trespass for an immediate and forcible injurydone to it. That case was for an injury done to an article of property, which by the Act of 1740, § 34, slaves are prohibited from owning, and yet being in the possession of the master, it was regarded as his property. Looking back over our legislation, and our decided cases, and the usages of our people, I think that we are well sustained in saying that a slave may acquire and hold in possession personal property, (not prohibited to him or her by Act of the Legislature) with the consent of the master or mistress, and that such property is in law to be regarded as. the property of the owner of the slave. Both deeds are therefore good, and must be sustained, unless by the Act of 1841, (11 Stat. at Large, 154) entitled “an Act to prevent the emancipation of slaves, and for other purposes,” they are rendered inoperative That Act has been supposed to be retrospective, but on carefully considering it, I think all its provisions are future, and I rejoice that they are so. For I should have thought it a stain upon the purity of our legislation, if it had been true that the Act had been passed to defeat vested rights.
That such an Act would have been contrary to our own constitution, which has declared that “no free man shall be disseized of his freehold, liberties, or privileges, or outlawed,for exiled, or in any manner deprived of his .life, liberty or property, but by the judgment of his peers, or the law of the land,” seems- *472 to me to be too plain to admit of argument. The motion to reverse the circuit decree is granted, and the complainant’s bill is dismissed.
JohnsoN, Harper, Richardson, Evans, Earle, and Butler, CC. and JJ., concurred.